# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS,
### EASTERN DIVISION

| | | |
|---|---|---|
| BURL MATHIAS and DESIREE MATHIAS | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No.: 01 C 6329 |
| | ) | |
| ACCOR ECONOMY LODGING, INC. and MOTEL 6 OPERATING L.P. | ) | Judge Joan Lefkow |
| | ) | Magistrate Judge Ashman |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION IN LIMINE TO BAR EVIDENCE CONCERNING DEFENDANTS' REFUSAL TO IMPLEMENT THE RECOMMENDED ROOM SWEEP

NOW COME the Plaintiffs, DESIREE MATHIAS and BURL MATHIAS, by their attorneys, PETER S. STAMATIS and ROBERT P. CUMMINS, and in response to Defendants' Motion in Limine to bar evidence concerning Defendants' refusal to implement EcoLab's recommended "room sweep," states as follows:

### *Preliminary Statement*

Evidence of defendants' decision to ignore their exterminator's recommendation to spray every room in their Chicago Motel 6 in late 1998 is directly relevant to the allegations in the Second Amended Complaint. Indeed, defendants want your Honor to bury this evidence because it offers a look into defendants' modus operandi – their practice of placing profits in front of the safety and security of their guests. The evidence is admissible and is a matter of weight for the jury. The jury should not be kept from hearing the whole truth.

### *Factual Background*

Defendants' refusal to implement EcoLab's 1998 "room sweep" recommendation is relevant and admissible, especially when viewed in the context in which it arose. Roughly two years prior to this recommendation, from October 29, 1996 until November 2, 1996, Ms. Carolyn Stanley of Morrison, Colorado spent four nights at a Motel 6 in Albuquerque, New Mexico. After awaking during the early morning hours of November 2, 1996, Ms. Stanley turned on the lights in her room and noticed that insects were crawling on her bed and inside her nightgown. The insects were later identified as *Cimex lectularius*. Ms. Stanley complained to the Motel's management, was refunded her last night's stay and returned home. In early 1997, Ms. Stanley developed large blotches and welts on her body. The source of her illness was unknown until April 16, 1996 when, in order to catch an early flight out of Denver, Ms. Stanley turned on the lights in her own bedroom and discovered dozens of insects crawling on her and on her husband.

Ms. Stanley immediately recognized the insects as the same type she saw in the Albuquerque Motel 6. The Stanley family then embarked on an odyssey to rid their home of this vermin. Among other things, they ripped out the carpet in their bedrooms, discarded mattresses, covered their furniture in industrial grade plastic for a year, hired exterminators, laundered bedding to kill insects, their eggs and remove the insects' blood fecal stains.

On or about May 5, 1997, Ms. Stanley wrote several individuals at Motel 6 including its president and CEO, Georges LeMener and its president of Quality Assurance, David O'Shaughnessy. In both those letters, Ms. Stanley, who had by that time learned a great deal about her new house guests, wrote:

> Bedbugs do not have to inhabit a "dirty place"; they hitch-hike in, and also
> hitch-hike out. I truly regret that the desk clerk had not expressed further
> interest in my statement, as a quick examination would have shown that
> the "bugs" were indeed bedbugs, and the advice of not taking my luggage
> into my house would have eliminated the current problem.

Two days later, Ms. Stanley wrote Stacy Searous, Director of Motel 6 Guest Relations.

There, she sent defendants information concerning her property damage, confirmed

sending defendants some treatises on *Cimex lectularius* and stated:

> As I knew nothing about them until now, I am also finding that many
> people think of [bedbugs] as simply a myth - "don't let the bedbugs bite."
> Not included are facts that bedbugs have the ability to sense a person's
> body heat the moment you walk into the room; they prefer women,
> children and in facts as the blood vessels are closer to the surface of the
> skin. They tend to avoid men as their skin is tougher. If you read the
> material you may better understand why this situation has been so
> traumatic. . . We are still itching and jumping at any spot that we see.

In closing, Ms. Stanley expressed the following sentiments to defendants:

> I would hope that at least my experience would lead to disbursement of
> such information to members of the Guest Relations Department and the
> Risk Department so that any other guest would not have to be subjected to
> the accusatory treatment I received.

Less than 18 months later defendants were made aware of *Cimex lectularius*

sightings in their Chicago, Illinois location. EcoLab technician, Robert Graves, testified

that in November of 1998 :

> A   . . . there were random sightings or random incidents, is a better word, of
>      bedbugs at the Motel 6 . . .
>
> Q   Approximately when was that?
>
> A   Approximately Thanksgiving, around Thanksgiving of 1998.[1]

As a result of these sightings, EcoLab proposed treating *all* the guest rooms at

defendants' Motel for *Cimex lectularius*.[2] EcoLab technician Robert Graves testified:

A:      I guess what I'm trying to say is at the time the management they had there, he wanted us to address the sightings that were they were beginning to have, and I told him that we needed to propose a room sweep; that I would have my area manager contact him about it, you know, because it would be separate from our regular service and I personally was not authorized to go above the agreement, so they did make contact.[3]

Although the proposal would have cost defendants only $500, defendants rejected EcoLab's recommendation to spray every room in the Motel because they parsimoniously did not want to spend the money. Technician Robert Graves testified at his deposition:

Q.      Did they tell you why it was rejected?

A.      Yes.

Q.      What did they say?

* * *

A       The area manager for Ecolab, my immediate supervisor, talked with the manager at the time of the Motel 6 facility . . . And his reply to it was that—Well, no, let me back up. Larry Aguirre told him we do all the guest rooms, not the entire hotel, the guest rooms. I want to be specific. And he would keep the price at around five hundred dollars.

Q       All right.

A       Emmett Dorgan replied that he would have to get approval from his boss and that he would get back with us on that topic. It was rejected.

Q       Did they say why? You're smiling and chuckling to yourself.

A       I don't want to put words in the management's mouth. I don't want to say I can recall word for word what he said.

Q       Give me the substance.

A       I don't want to speculate.

Q       You don't have any recollection of the substance of what was said like, bedbugs don't hurt anybody or—

---

[1]  Deposition of Robert Graves at p.28, ln.12-19. A copy of the relevant pages are attached hereto as Exhibit 1.
[2]  Deposition of Robert Graves at p.29, ln. 21. A copy of pages 29-35 attached hereto as Exhibit 2.
[3]  *See* Exhibit 2.

A.     No.  It was nothing of that nature.  The gist of it was that they were already paying for service and he just didn't want to pay extra, but may I just complete what I'm saying?

Q      Absolutely.

A      The EcoLab agreement that we have with that property is stated on the service report as rats, mice, and cockroaches.  That is the reason why it ever came up about a room sweep was because it did not pertain to the subject matter of the contract agreement.[4]

Approximately one year later and because the problems continued, a room sweep was again discussed, this time by the defendants when on or about October 18, 1999, they called EcoLab and asked "for an estimate to spray *entire facility* for all kinds of creepy crawling critters."[5]   Defendants wanted the treatment of the entire facility to be "done around Christmas" and such a decision had to be "approved" by a "supervisor."[6]

However, for pecuniary reasons, defendants did not sweep the entire Motel for insects.  Over one month later, the issue resurfaced and the motel's manager, Emmett Dorgan, advised defendants' District Manager, William Holmes, that Dorgan was trying to negotiate "a building sweep *free of charge* . . ." with EcoLab and told his manager that EcoLab would "consider it."[7]  Like before, no sweep was ever performed.[8]

## A.     Rule 402 Requires the Admission of The Proposed and Rejected Motel Sweep.

Evidence of defendants repeated refusals to pay for a "sweep" or to spray all 191 rooms in their motel for *Cimex lectularius* establishes *all six counts* in Plaintiffs' Second Amended Complaint.  The evidence is neither unfairly prejudicial nor is its probative

---

[4] *Id.* at p.33, ln.15 to p.35, ln.3.
[5] *See* EcoLab's Log of Customer Calls into Service Center Attached Hereto as Exhibit 3.
[6] *Id.*
[7] *See* facsimile of November 24, 1999 to Defendants' Area Manager, William Holmes attached hereto as Exhibit 4.
[8] *See* EcoLab's "Invoice Customer Service Report[s]" of October 5, 1999 and November 3, 1999 attached hereto as Group Exhibit 5.

value outweighed by any prejudice let alone *unfair* prejudice. The jury has a right to hear this evidence.

Federal Rule of Evidence 402 declares all "relevant evidence" admissible at trial unless precluded by the United States Constitution or other federal statute or rules. Fed. R. Evid. 402. "Relevant Evidence" is defined as any evidence that tends to make "the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. In other words, evidence is relevant whenever it possesses some logical probative value toward some fact that is legally of consequence to a case. While the Rules provide, under certain circumstances for the exclusion at trial of evidence that is relevant, such a ruling is justified only when the "probative value" of the evidence is *substantially* outweighed by the danger of *unfair* prejudice, the evidence causes confusion, delay, or is misleading or cumulative. Fed. R. Evid. 403. *See also United States v. Dervisevic,* 2002 WL 76973, *1 (N.D. Ill. 2002) (Lefkow) ("in applying the balancing test of Rule 403 'relevant evidence should only be excluded if its probative value is *substantially* outweighed by any of the listed concerns in Rule 403." *citing to United States v. Jackson,* 886 F.2d 838, 847 (7th Cir. 1989)). Further, in weighing the considerations enumerated in Rule 403, the general rule is that the balance should be struck in favor of admission." *United States v. Denberg,* 212 F.3d 987, 993 (7th Cir. 2000). Finally, Rule 403 is an extraordinary remedy to be used sparingly as it permits the trial court to exclude otherwise relevant evidence." *United States v. Meester,* 762 F.2d 867, 875 (11th Cir. 1985).

### a. The Evidence Supports Count V – Gross Negligence

Evidence of the defendants' refusal to implement its exterminator's recommendations and pay for a sweep of all the rooms in defendants' motel establishes the willful and wanton nature of defendants' conduct. Willful and wanton negligence is established by, among other things, a defendant's "failure, after knowledge of impending danger," to exercise ordinary care to prevent the danger. *Ziarko v. Soo Line Railroad,* 161 Ill.2d 267, 274, 641 N.E.2d 402, 406, 204 Ill. Dec. 178, 182 (1994) *citing to Schneiderman v. Interstate Transit Lines, Inc.* 394 Ill 569, 583, 69 N.E.2d 293 (1946). The evidence (which is devastating to defendants) is directly on point as to this count as well: It goes to show defendants' knowledge of the danger to which they subjected the Mathiases, their knowledge of what it would take to eradicate the infestation and their refusal to pay for this service. The evidence should be submitted to the jury for this reason alone.

### b. The Evidence Supports Count VI – Negligence.

Finally, evidence of the defendants' refusal to implement room sweeps shows breach of duty to their business invitees. Burl and Desiree should prevail on this count as well. The evidence defendants seek to keep hidden goes directly to show defendants breached their duty to act as reasonably prudent innkeepers when they rented plaintiffs a room that they knew was infested with insects that would injure the Mathiases while they slept.

**B.** **Evidence That The Defendants' Refused to Implement EcoLab's Recommendation of a Sweep of the Entire Motel is Admissible Under Rule 404 to Show Defendants Refusal to Remedy The Dangerous Conditions in their Motel.**

The Federal Rules of Evidence provide for the admission of evidence of a defendant's prior acts whenever such evidence is used to prove a defendant's knowledge of the dangerous conditions in their motel and the absence of mistake or accident. Fed. R. Evid. 404(b). Under Rule 404(b), such evidence is admissible whenever the proponent can establish: 1) the evidence is directed toward establishing a matter in issue other than the defendants' propensity to commit the alleged act; 2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; 3) the evidence is sufficient to support a jury finding that a defendant committed a similar act; and 4) the evidence has probative value that is not substantially outweighed by the danger of unfair prejudice. *Okai v. Verfut,* 275 F.3d 606, 610 (7th Cir. 2001).

All four prongs are met in this case and evidence of defendants' refusal to implement the recommended room sweeps should not be hidden from the jury. First, evidence of the refusal establishes defendants' refusal to remedy the dangerous conditions in their motel and the absence of mistake or accident on their part when they rented the Mathiases room 504. Second, the evidence is from only two years prior to the Mathias' arrival at the motel – two years filled with complaints of *Cimex lectularius* sightings, complaints of injuries from *Cimex lectularius* and EcoLab identification of bedbugs in the motel. It could not be any closer in time or any more relevant for that matter. Indeed, the fact that the problem has existed for years at this property only further establishes the need for punitive damages. The evidence is overwhelming. Third, evidence of the defendants' refusal supports a jury finding that a defendants' indifference

manifested itself in their treatment of the Mathiases. Fourth, the evidence has probative value that is not substantially outweighed by the danger of *unfair* prejudice. There is nothing *unfair* about advising the jury of the refusal to follow Ecolab's recommendation. Indeed, it is expected that defendants will claim "clean hands" at trial - that they did whatever their exterminator told them to and therefore, no liability attaches. Indeed the evidence serves to prove, among other things, defendants' knowledge and conduct. For this reason as well, defendants' motion should be denied.

WHEREFORE, Desiree Mathias and Burl Mathias respectfully request this Honorable Court enter an order denying defendants' Motion in Limine and that evidence of the defendants' failure to comply with the recommendations of EcoLab be presented to the jury at trial.

Respectfully submitted

_____
One of the attorneys for Burl Mathias and Desiree Mathias

PETER S. STAMATIS
Law Offices of Peter Stamatis, P.C.
77 West Wacker Drive, Ste. 4800
Chicago, Illinois 60601
Telephone: (312) 606-0045
Facsimile: (312) 606-0085

ROBERT P. CUMMINS
Cummins & Cronin
77 West Wacker Drive, Ste. 4800
Chicago, Illinois 60601
Telephone: (312) 578-0500
Facsimile: (312) 578-1234

*See Case File for Exhibits*