IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

FILED

JUL 1 1 2002

JUDGE JOAN H. LEFKOW
UNITED STATES DISTRICT COURT

BURL MATHIAS and DESIREE MATHIAS,

Plaintiffs,

v.

ACCOR ECONOMY LODGING d/b/a MOTEL 6,

Defendants.

No. 01 C 6329

Judge Joan Lefkow
Magistrate Judge Ashman

DOCKETED
JUL 1 6 2002

## NOTICE OF MOTION

**TO:** Peter S. Stamatis
77 W. Wacker Dr. Suite 4800
Chicago, Illinois 60601

Robert P.Cummins
77 W. Wacker Dr. Suite 4800
Chicago, Illinois 60601

Please Take Notice that on July 12, 2002 at 3:30 p.m., we will appear before the Honorable Judge Joan Humphrey Lefkow, Room 1925, at 219 S. Dearborn Street, Chicago, Illinois, or any judge sitting in her stead and present the attached **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.**

[signature]
One of the Attorneys for
Motel 6 Operating L.P.

## CERTIFICATE OF DELIVERY

Timothy J. Murphy hereby certifies under penalty of perjury as provided by law pursuant to the applicable court rules that the above notice and attached pleadings were served upon counsel of record by hand delivery on July 11, 2002.

[signature]
Timothy J. Murphy

Timothy J. Murphy
Maureen A. McGuire
MacCABE & McGUIRE
77 West Wacker Drive, #3333
Chicago, IL 60601
Telephone: 312-357-2600
Facsimile: 312-357-0317
M:\ORANGE\51-100\-155\Notice of Motion 7 11 02.doc

128

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

FILED
JUL 11 2002
JUDGE JOAN H. LEFKOW
UNITED STATES DISTRICT COURT

**BURL MATHIAS and DESIREE MATHIAS,**

**Plaintiffs,**

**v.**

**ACCOR ECONOMY LODGING d/b/a MOTEL 6,**

**Defendants.**

**No. 01 C 6329**

**Judge Joan Lefkow**
**Magistrate Judge Ashman**

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants, ACCOR ECONOMY LODGING, INC. and MOTEL 6 OPERATING L.P., by their attorneys, Maureen A. McGuire and Timothy J. Murphy, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, respectfully moves this Court for entry of summary judgment on plaintiff's Complaint for the reason that there is no genuine issue of material fact and that defendant is entitled to judgment as a matter of law. In support of its Motion, defendant submits the following:

DOCKETED
JUL 16 2002

1. Evidentiary materials in support of its motion, including exhibits:

   A. Deposition testimony of Burl Mathias
   B. Deposition testimony of Desiree Mathias

2. Memorandum of Law.

Respectfully submitted,

MacCabe & McGuire

By: [signature]
One of Attorneys for Defendant,
ACCOR ECONOMY LODGING, INC. and MOTEL 6 OPERATING L.P.

Timothy J. Murphy
MacCabe & McGuire
77 W. Wacker Drive, Suite 3333
Chicago, IL 60601
Telephone: (312)357-2600
Facsimile: (312)357-0317
M:\ORANGE\51-100\-155\Motion for summary judgment.doc

128

DOCKETED
JUL 1 6 2002

FILED
JUL 1 1 2002
JUDGE JOAN H. LEFKOW
UNITED STATES DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

**BURL MATHIAS and DESIREE MATHIAS,**

**Plaintiffs,**

**v.**

**ACCOR ECONOMY LODGING, INC. and MOTEL 6 OPERATING L.P.**

**Defendants.**

**No. 01 C 6329**

**Judge Joan Lefkow**
**Magistrate Judge Ashman**

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON COUNT IV - THE ILLINOIS CONSUMER FRAUD ACT**

Defendants, ACCOR ECONOMY LODGING, INC. ("ACCOR") and MOTEL 6 OPERATING L.P., ("MOTEL 6"), by their attorneys, Maureen A. McGuire and Timothy J. Murphy, for their Memorandum of Law in Support of their Motion for Summary Judgment on Count IV of the plaintiffs' Second Amended Complaint states as follows:

***Standard for Summary Judgment***

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the non-moving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548 (1986). For those issues where the moving party will not have the burden of proof at trial, the moving party need only point out to the district court that there is an absence of evidence to support the non-moving party's case. Id. at 325. In responding to summary judgment, the non-moving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505

128

(1986). As such, the non-moving party must demonstrate more than a scintilla of evidence. Harbin v. Burlington Northern Railroad Company, 921 F. 2d 129, 130 (7th Cir. 1990).

***Count IV – Illinois Consumer Fraud Act***

In Count IV of the plaintiffs' Second Amended Complaint, plaintiffs allege a cause of action under the Illinois Consumer Fraud Act, which provides in relevant part:

> Unlawful practices-Construction with Federal Trade Commission Act:
>
> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use of employment of misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use of employment of any practice described in section 2 of the Uniform Deceptive Trade Practices Act, approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/1 et seq. Defendants are entitled to judgment on Count IV of the plaintiffs' Second Amended Complaint for two reasons: (1) the plaintiffs' pleading is deficient on its face; (2) the plaintiffs fail to present sufficient evidence to establish a cause of action under the Illinois Consumer Fraud Act.

*The Deficient Pleading*

As a preliminary matter, Count IV of the plaintiffs' Second Amended Complaint fails to satisfy the Illinois pleading requirements for a cause of action under the Illinois Consumer Fraud Act. Defendants raised this issue with regard to the plaintiffs' original Complaint by way of a Motion to Dismiss pursuant to Rule 12(b)(6). Defendants' motion was denied by this honorable Court to allow plaintiffs the opportunity to conduct discovery to uncover the specific facts surrounding the alleged misrepresentation. Plaintiffs made no attempt during discovery to uncover these facts and cannot now expect the jury to speculate as to how and when the misrepresentation occurred.

"Claims made pursuant to the Illinois Consumer Fraud Act...*must state* the identity of the

clerk *intentionally concealed the information to induce reliance* on the part of Burl and Desiree Mathias, plaintiffs have insufficient evidence to satisfy the third element of proof required by the Consumer Fraud Act. Without this evidence, plaintiffs are inviting the jury speculate that an unidentified clerk made some misrepresentation at some time about the condition of the room and that the representation was made with the specific intent to induce Burl and Desiree Mathias to stay in the room.

Further, plaintiffs also fail to establish the requisite causal connection between defendants' alleged misrepresentation and the injuries sustained by plaintiffs in this case. Although reliance is not a specific element of this cause of action, Illinois counts require that the plaintiffs establish that the misrepresentation or concealment "***proximately caused***" their injury. Anderson v. Rizza Chevrolet, Inc., 9 F.Supp.2d 908 (N.D. Ill. 1998).

Desiree Mathias did not make the reservation for the room at the Motel 6 prior to the occurrence. (Dep. of Desiree Mathias at p. 43). Desiree Mathias testified that she could recall no specific details about any conversation she had with any representative of Motel 6 upon her arrival at the Motel 6 on the date of the occurrence. (Dep. of Desiree Mathias at p. 43-46). Further, Desiree Mathias testified that upon her arrival at the Motel 6, her brother Burl Mathias had already checked into the room. (Dep. of Desiree Mathias at p. 43-46).

Burl Mathias admitted during his discovery deposition that he reserved the room via telephone and in advance of his stay at the Motel 6 located at 162 East Ontario in Chicago, Illinois. (Dep. of Burl Mathias at p. 20). Burl Mathias admitted during deposition that the sole reason he selected the Motel 6 was because he saw the Motel 6 while walking on the Magnificent Mile and because he had frequented the Motel 6 prior to the occurrence. (Dep. of Burl Mathias at p. 21). By his own admission, his decision to stay at the Motel 6 was not *proximately caused* by any

misrepresentation made by any agent of Motel 6. Further, Burl Mathias admitted during deposition that Motel 6 made no statements about the condition of the room when the reservation was made and that he had no further conversation with Motel 6 until the date of his arrival. (Dep. of Burl Mathias at p. 21). Mathias also admitted during deposition that at the time the room was assigned, Motel 6 made no statements regarding the condition of the room. (Dep. of Burl Mathias at p. 29). Lastly, Burl Mathias could not even recall the exact facts and circumstances surrounding the alleged misrepresentation as evidenced by the fact that he was not even sure about the sex of the individual working at Motel 6 with whom he spoke on the date of the occurrence. (Dep. of Burl Mathias at p. 29). In sum, defendants cannot establish by any evidence that Motel 6 made any misrepresentation with the intent to induce or that the plaintiffs' decision to stay at the motel six was proximately caused by an alleged misrepresentation regarding the condition of the room.

WHEREFORE, defendants ACCOR ECONOMY LODGING, INC. ("ACCOR") and MOTEL 6 OPERATING L.P., ("MOTEL 6"), by their attorneys, Maureen A. McGuire and Timothy J. Murphy, respectfully request that this Court enter judgment in its favor in Count IV of the plaintiffs' Second Amended Complaint.

Respectfully submitted,

MacCabe & McGuire

By: ______________________________
One of the attorneys for the Defendant,
ACCOR ECONOMY LODGING, INC. and
MOTEL 6 OPERATING L.P.

Timothy J. Murphy
MacCabe & McGuire
77 W. Wacker Drive
Suite 3333
Chicago, Illinois 60601
Telephone: 312-357-2600
Facsimile: 312-357-0317
M:\ORANGE\51-100\-155\Motion in Limine - Room 504.doc

ee or four years, was that prior to November of 2000 is that since from today's date?

A. Probably prior to November.

Q. And is she still a friend of yours?

A. Yes.

Q. Did she stay in the same room with you on the ht of November 4th and November 5th?

A. Yes.

Q. In which bed did she sleep?

A. The bed by the window.

Q. In what bed did you sleep?

A. In the bed by the window.

Q. And your brother slept in the other bed?

A. Yes.

Q. So after you checked into the Motel 6 with brother and Kim Irving on Saturday afternoon of ember the 4th, what did you do?

MR. STAMATIS: Objection, foundation.

You can answer.

THE WITNESS:

A. I don't believe Burl was with us.

MR. STAMATIS: Just answer the question.

MR. MURPHY:

Q. Did you fly with Kim Irving to Chicago?

A. Yes.

Q. Did your brother Burl fly with you also?

A. No.

Q. On the same plane?

A. No.

Q. Did you arrive in Chicago prior to your brother or after him?

A. Prior.

Q. And so when you went to check in at the hotel, it was just you and Kim Irving?

A. Yes.

Q. And you checked into the property that afternoon?

MR. STAMATIS: Objection.

BY THE WITNESS:

A. We left our bags at the hotel.

Q. Were you allowed to go into your room when you arrived at the hotel that day?

A. No.

Q. Was the room not ready for you?

A. I don't know.

MR. STAMATIS: Objection to form.

BY MR. MURPHY:

Q. So when you arrived at the motel, who did you

k with, if you know?

A. I don't recall.

Q. Did you go to the front desk to check in?

A. Yes.

Q. Do you know if you spoke with a man or a an?

A. I don't recall.

Q. Do you recall any conversation that you had the person at the front desk on the afternoon of rday, November 4th?

MR. STAMATIS: Objection to form and time frame. You talking about when they checked in or later evening?

MR. MURPHY:

Q. "When you arrived at the hotel." That's what id, I believe.

A. And the question, sorry, is?

Q. Do you recall any conversation that you had a representative or a person at the front desk at l 6 when you arrived at the hotel on November 4th?

A. I don't recall any specific details.

Q. Was the reservation in your name?

A. I don't know. I'm going to say no, I don't eve so.

Q. Did you go directly to a room when you arrived at the hotel?

A. No.

Q. What were you told about the availability of your room at the motel that day, if anything?

A. Can you repeat the question?

Q. What were you told about the availability of your room that afternoon on November 4th when you arrived at the hotel?

A. That it wasn't available.

Q. Other than being told the room wasn't available, do you recall any other conversation you had with the person at the Motel 6 that afternoon?

A. No, I don't recall.

Q. So what did you do upon hearing that your room was not available?

A. I left my bags there.

Q. Did Kim Irving leave her bags as well?

A. Yes.

Q. Where did you leave your bags?

A. At Motel 6.

Q. At the front desk?

A. Yes.

Q. Then what did you do?

A. Went for lunch. Went shopping.

Q. Had you made arrangements to meet your brother at any time that day?

A. Yes.

Q. What time were you supposed to meet your brother?

A. I don't recall.

Q. Do you recall, after going shopping and having lunch, did you return to the Motel 6?

A. Yes.

Q. And what time was that at? Approximately. I'm not going to hold you to a minute.

A. Approximately 6:00 o'clock.

Q. In the evening, right?

A. Yes, p.m.

Q. When you arrived back at the Motel 6 around 6:00 p.m. on November 4th, was your room available?

A. Yes.

Q. Do you recall the room number?

A. Yes.

Q. What room was it?

A. Room number 504.

Q. Had your brother already arrived when you got back to the motel?

A. Yes.

Q. Had he already checked into the room?

A. I believe so.

Q. Did you speak with anyone at the front desk when you arrived back there at approximately 6:00 o'clock p.m. on November the 4th?

A. I don't recall.

Q. Do you remember being given a key to the room?

A. I don't recall, but I must have.

Q. Were you given your luggage?

A. Yes.

Q. Or had the luggage been taken up to your room?

A. I don't recall.

Q. Did you go directly then to Room 504?

A. Yes.

Q. When you arrived in Room 504, what did you do?

A. I said hi to Burl.

Q. He was in the room?

A. Actually I said that, but I don't recall if he was in the room.

Q. Do you recall doing anything else upon your

arrival in Room 504 around 6:00 o'clock on November the 4th?

A. Put our bags away. Left our bags in the room.

Q. Did you unpack your bags?

A. Some of the things.

Q. What did you unpack?

A. I don't recall exactly what I unpacked.

Q. Did you inspect the room visually?

MR. STAMATIS: Objection to form, foundation.

THE WITNESS:

A. Not that I recall. I mean, I glanced at the room, but I didn't inspect it.

Q. Did you look into the bathroom, make sure it was clean?

A. Yes.

Q. You looked around the room and made sure it was clean?

A. Looked into the bathroom to make sure that it was clean. Glanced at the room.

Q. Did you find anything that you would have called the front desk about?

A. Not at that time.

Q. What did you do next?

A. I don't recall exactly what we did next.

Q. How long did you stay in the room when you first went in there?

A. Perhaps about an hour, hour and a half.

Q. Watch television?

A. I don't believe that I did.

Q. Did Kim Irving watch television?

A. I don't recall.

Q. Did you lie down on the beds at all during that hour, hour and a half?

A. I probably did.

Q. Do you specifically recall lying down on the bed that afternoon or that evening, November 4th?

A. Yes.

Q. Did you have the bedspread down on the bed when you were lying down, or were you lying down on the bedspread?

A. I recall lying down on top of the bedspread.

Q. Did you sleep at all?

A. Not at that time, that I recall.

Q. During the hour or hour and a half, whatever that time frame, did your brother enter the room, come into the room?

A. I believe so.

A. Not to my knowledge.
Q. Do you have any correspondence, either to or from Motel 6, regarding the occurrence specified in your complaint?
A. Not to my knowledge at this time.
Q. Do you have any written reports of the incident -- the occurrence of which you complain?
MR. STAMATIS: Objection to form.
You can answer.
BY THE WITNESS:
A. Not that I can recall.
Q. Do you have any photographs of the location, the scene of the occurrence, of which you complain?
A. Not that I can recall.
Q. Do you have any photographs of the injuries allegedly received in the occurrence of which you complain?
A. No.
Q. Do you know if any photographs were taken of the injuries which you have -- of your injuries that you claim were received in the underlying occurrence?
A. Could you repeat that again?
Q. Do you know of any photographs taken of your injuries that you allege occurred -- resulted from the

underlying occurrence?
A. Yes.
Q. And who took the photographs?
A. Desiree and Wendy, my wife.
Q. Does your wife still have possession of the photographs that she took?
A. Not that I recall.
Q. Do you know what your wife did with the photographs?
A. Gave them to me.
Q. What did you do with the photographs?
A. Placed them -- Placed them with Desiree.
Q. You didn't keep copies of any of those photographs?
A. Not that I can recall.
Q. Do you know if your wife still has the negatives of those photographs?
A. Not that I can recall.
MS. MATHIAS: Can I just interrupt for a moment?
MR. STAMATIS: No.
Can we take a 30-second break?
(Exit Ms. Mathias.)
(A short break was had.)
MR. STAMATIS: Back on.

MR. MURPHY: Back on.
BY MR. MURPHY:
Q. Do you have any police reports that were prepared in conjunction with the underlying occurrence?
A. No.
Q. Any accident reports?
A. Not that I can recall.
Q. Any ambulance reports?
A. No.
Q. Any incident reports?
A. Not that I can recall.
Q. Directing your attention to November the 4th of 2000, did you have occasion to travel to Chicago, Illinois, on that day?
A. What was the date, again?
Q. November 4th of 2000.
A. Yes.
Q. What was the reason for your travel?
A. For a trade show.
Q. And what was the name of the trade show?
A. Pacex, P A C E X.
Q. And where was that trade show being held?
A. By McCormick.
Q. Had you ever attended a trade show before?

A. Yes.
Q. And when had you previously attended the Pacex show at McCormick Place?
A. I don't recall.
Q. Do you know how frequently that trade exhibit is held?
A. I don't recall.
Q. And for how long were you attending the Pacex trade show?
A. Until November the 6th.
Q. And did you make the reservations for your travel to Chicago?
A. Yes.
Q. Did you make the flight arrangements?
A. Yes.
Q. Did you make the hotel arrangements?
A. Yes.
Q. How did you come to select the Motel 6 at 162 East Ontario?
Now, for the record, we'll stipulate, if I use the words "Motel 6," we're referring to the specific property at 162 East Ontario, so I don't have to keep repeating the address. All right?
MR. STAMATIS: So stipulated.

BY THE WITNESS:
A. I was walking on Magnificent Mile, and I saw it.
Q. And when did you -- When had you seen it? When were you walking on Magnificent Mile, which is Michigan Avenue, and saw the hotel?
A. Years ago.
Q. Had you ever stayed at that property before?
A. Yes.
Q. When was the last time, prior to November of 2000, that you had stayed at that property?
A. About a month, two months prior.
Q. Do you recall what room you stayed in when you stayed at the Motel 6 there sometime in the month or two before November of the year 2000?
A. I don't recall.
Q. Had you ever stayed at that motel on any other occasion?
A. I don't recall.
Q. When did you make your reservation for the Motel 6 for the weekend of November 4th through 6th?
A. I don't recall.
Q. Did you make the reservation in person, or did you do it by telephone?

MR. STAMATIS: Objection to form.
BY THE WITNESS:
A. By phone.
Q. Do you know who you spoke with on the telephone?
A. No, I don't recall.
MR. STAMATIS: Sorry. Can we take a break?
(A short break was had.)
MR. MURPHY: Back on the record.
BY MR. MURPHY:
Q. When you made the reservation on the phone, what type of a room did you request?
A. It needed to be two double beds.
Q. And the reservation was for how many people?
A. I don't recall.
Q. And when you made this reservation, was your plan to travel with your sister?
A. I don't recall.
Q. If you needed -- Well, why did you need two double beds?
A. I usually get it.
Q. So you don't remember if Desiree was going to attend this convention with you or not at the time you made the reservation?

A. Yes.
Q. Do you recall anything -- Do you recall any of the conversation you had with the person with whom you spoke at the Motel 6 when making the reservation?
A. Can you be a little bit more specific on that?
Q. Do you recall anything that was stated to you by the person at the Motel 6 with whom you made the reservation regarding your reservation of the room?
MR. STAMATIS: Objection to form, foundation.
BY THE WITNESS:
A. Nothing that -- Nothing besides the standard, "How many people" or what, but -- Just the standard questions were asked, and that was basically it.
Q. And you were given a confirmation number?
A. Yes, I was.
Q. After making the reservation sometime before November of 2000, did you have any further conversations with the Motel 6 regarding your stay there?
A. Could you repeat the last part of that question?
Q. Did you have any further contact or conversation with anyone at Motel 6 about your reservation for the weekend of November 4th through 6th?
MR. STAMATIS: Objection to the time frame.

Are you talking about before they got there?
BY MR. MURPHY:
Q. Between the time you made the reservation and the time you got there, did you have any further conversations with anyone at the Motel 6?
A. No, I don't recall.
Q. So you didn't call to change your reservation or confirm your reservation after it was made?
A. No.
Q. Okay.
A. I don't recall, but I wouldn't do that.
(Brief pause.)
BY MR. MURPHY:
Q. Mr. Mathias, I'm going to show you what's been previously marked as Exhibit No. 2 and ask if you've ever seen or if you can identify that exhibit for me.
A. Yes, I have seen ...
Q. And what is that?
A. An airline ticket.
Q. Was this for your travel to Chicago on November 4th of 2000?
A. Let me see the dates.
I believe so.
Q. The exhibit indicates a cost per passenger of

$344.80, Canadian; is that correct?
A. Yes.
Q. And was that the amount that you paid for your irline ticket?
A. I'm not sure.
Q. Do you know if that was for a round-trip icket or for a one-way ticket?
A. I'm sorry. That's what I was not sure about. he dollar value is there, but I'm not sure if it was or a complete round trip or not. It doesn't really tate anything.
Q. Okay. You don't recall whether or not that vas the price that you paid for your ticket, whether it vas covered both ways or just one way?
A. Exactly.
Q. And do you have any receipt for your return ight to Canada on November the 6th?
A. Not that I can recall.
Q. And did you take the flight as scheduled, as sted on Exhibit No. 2?
A. Where would the flight number be or ...
Q. The flight number is down there.
A. I can't verify whether this was my flight or ot because of the way it's written.

Q. Who did you travel with when you flew to Chicago on November the 4th?
A. By myself.
Q. Was your sister also traveling to Chicago for the trade show?
A. Could you be more specific on that?
Q. On November 4th of 2000, was your sister also intending to attend the Pacex trade show with you in Chicago?
A. Yes, she was.
Q. And that is your sister Desiree?
A. Yes.
Q. And for the remainder of this deposition, if I say "your sister," I mean Desiree and not Rochelle.
A. Okay.
Q. Okay. Thank you.
But you flew separately from your sister?
A. Yes.
Q. And did you plan to travel separately from your sister, or was that a change in your travel plans?
A. I can't recall.
Q. Was anyone else traveling with you and your sister to the Chicago area from Toronto?
A. I traveled by myself.

Q. Do you know who your sister traveled with?
A. She traveled with her girlfriend, Kim.
Q. And do you know Kim Irving?
A. Yes, I do.
Q. And how do you know Kim Irving?
A. Through Desiree.
Q. And did you know that she was going to be aveling and staying with you at the Motel 6 in Chicago ver the weekend of November 4th through November 6th?
A. Yes.
Q. Had Kim Irving ever traveled with you and your ster before?
A. Not that I can recall.
Q. And you didn't have any discomfort with her aying in the same room with you and your sister?
MR. STAMATIS: Objection to the form and undation.
THE WITNESS:
A. No.
Q. Okay. And your wife didn't have any problem ith it, either?
A. No.
Q. What time did you arrive in Chicago on ovember the 4th, if you recall?

A. I believe late evening -- or -- No -- Yeah, evening time, I would say.
Q. Did you go directly to Motel 6 upon your arrival in Chicago?
A. Yes.
Q. Had your sister already checked into the room?
MR. STAMATIS: Objection, foundation.
BY THE WITNESS:
A. No.
Q. Do you recall who you spoke with when you checked into the Motel 6 on November the 4th?
A. Front desk.
Q. Do you remember -- Do you know the name of the person there?
A. Not that I can recall.
Q. Do you know if this was a male or female?
A. There were females behind the counter, I think, that were helping.
Q. And what did you say to them, and what did they say to you upon your arrival at the Motel 6, or what did the person who you spoke to say?
A. "Can I help you?"
Q. And what did you respond?
A. "I'm here to check in."

29

Q. And what did they say?
A. Name and credit card, et cetera, their tandard procedure; and that was basically it.
Q. Was there anything -- Were any questions aised at the time of your check in?
MR. STAMATIS: Objection, foundation.
Y MR. MURPHY:
Q. By them about your reservation? Was there any roblem with your reservation?
A. They had my reservation; and by the looks of they had some confusion in the back. But what I -- esiree actually flew in earlier, and I didn't know hether she had already checked in or not. And so I ist gave them my name and -- I gave them my name, and ey said nobody had checked in. So I said, "Well, heck me in," and that was basically it.
Q. Do you remember the room to which you were ssigned?
A. Yes, I do.
Q. What number was it?
A. 504.
Q. You said there was some confusion. Was that hether or not someone had already checked in under the servation?

30

A. Yes, because they were flying in on an earlier flight, and I didn't know whether they had gone in and checked in or not.
Q. Okay. Did you go directly to Room 504, then?
A. I believe so.
Q. And upon your arrival at Room 504, did you check to see what was the condition of the room?
A. Upon my arrival? Yes.
Q. And did you find anything that was out of order or unacceptable to you?
A. It had that -- It had an odor, like, a smell. But it looked like it was either just cleaned -- but a very strong smell; and that was basically it. That was the thing that I noticed.
Q. Other than noticing a strong odor, was it, like, soap? A soap smell?
A. To be honest, you know, they have this spray that they spray in these rooms. I just thought they must have just cleaned up the room, in, like, within five minutes of myself arriving or so; so I figured it was just the spray that I smelled.
Q. So it was like a deodorizer-type smell?
A. I would say so, yes. They could have used the whole can in there.

31

Q. You mean, it was that strong?
A. It was strong.
Q. Okay. It was like an air-freshener-type nell?
MR. STAMATIS: Objection, asked and answered.
Y THE WITNESS:
A. No, it wasn't an air-freshener smell. It as -- It wasn't like an air freshener. It was mething different.
Q. Did it smell like any particular substance, ke a fruit, a flower, a flavor?
A. I couldn't -- It had an odor to it. I can't call.
Q. So after you entered the room, you noticed the nell. Did you see anything else -- Did you notice nything else about the room?
A. No.
Q. It seemed acceptable to you?
A. I believe so, yes.
Q. And what did you do next?
A. Tossed my bags down, unpacked a little bit.
Q. In the course of your duties in your cupation, do you travel frequently?
A. What is "frequently"?

32

Q. Well, do you travel outside of the Toronto area on a -- once a month?
A. I wouldn't say once a month.
Q. Once every two months?
A. No.
Q. Four times a year?
A. That would be a good estimate.
Q. And when you travel for business, what are your typical destinations?
MR. STAMATIS: Objection, foundation.
BY THE WITNESS:
A. Chicago is a main stop for business; Germany is a second; and various cities in the United States, but nothing does seem to stand out.
Q. Other than Germany, is there any other -- any other place to which you travel outside of North America?
A. Not that I can recall.
Q. Okay. And what about within Canada? How frequently do you travel within Canada or other cities in Canada?
A. Not too often.
Q. How frequently do you travel to Germany?
A. Once every couple of years.